## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| STEAMFITTERS LOCAL 449 PENSION FUND, individually and on behalf of all Others similarly situated, | : : : | NO. |
| | : | |
| Plaintiff, | : : | CLASS ACTION |
| | : | |
| v. | : | |
| | : | COMPLAINT FOR VIOLATION |
| CENTRAL EUROPEAN DISTRIBUTION | : | OF THE FEDERAL |
| CORPORATION, CHRISTOPHER | : | SECURITIES LAWS |
| BIEDERMANN and WILLIAM V. CAREY, | : | |
| | : | |
| Defendants. | : | DEMAND FOR JURY TRIAL |

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Central European Distribution Corporation ("CEDC" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of the common stock of CEDC between August 5, 2010 and February 28, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Defendant CEDC operates primarily in the alcohol beverage industry as one of the largest producers of vodka in the world and Central and Eastern Europe's largest integrated spirit

beverages business, measured by total volume, with approximately 32.7 million nine-liter cases produced and distributed in 2010.

3.      During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results.

4.      In a press release dated March 1, 2011, CEDC announced its results for the full year 2010, surprising the market and reporting a net loss from continuing operations on a U.S. Generally Accepted Accounting Principles ("GAAP") basis for the year of $92.9 million, or $1.32 per fully diluted share, as compared to a net profit of $72.7 million, or $1.35 per fully diluted share, for the same period in 2009.  The Company reported net income from continuing operations of $38.7 million, or $0.55 per fully diluted share, for the full year 2010, as compared to $118.9 million, or $2.20 per fully diluted share, for the same period in 2009 and previous guidance of earnings per share ("EPS") of between $1.50 and $2.20 per share.  The loss was due in part to an impairment charge.

5.      In response to the unexpected earnings announcement, shares of the Company's stock fell $8.52, or more than 37%, to close at $14.33 per share, on extremely heavy trading volume.

6.      The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were that the Company was presenting its financial statements in violation of GAAP, causing its financial results to be materially misstated.

7.      As a result of defendants' false statements, CEDC's securities traded at artificially inflated levels during the Class Period.  After the above revelations seeped into the market, the price of CEDC common stock was hammered by massive sales, sending them down nearly 48% from their Class Period high of $27.44 per share on December 2, 2010.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act [15 U.S.C. §78aa].

10.     Venue is proper in this District pursuant to §27 of the Exchange Act, and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

11.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

12.     Plaintiff Steamfitters Local 449 Pension Fund, as set forth in the accompanying certification and incorporated by reference herein, purchased the publicly traded common stock of CEDC during the Class Period and has been damaged thereby.

13.     Defendant CEDC operates primarily in the alcohol beverage industry.  CEDC is a producer of vodka and is Central and Eastern Europe's largest integrated spirit beverages business. CEDC's primary operations are conducted in Poland, Russia and Hungary.  The Company maintains its principal executive offices in this District.

14.     Defendant William V. Carey ("Carey") was, at all relevant times, Chairman, Chief Executive Officer, and President of CEDC.  He has held these positions since 1998.  As noted in the Company's Proxy, "As President and Chief Executive Officer of CEDC, William Carey holds the

most direct responsibility for the performance of the Company's various businesses. . . .  As a consequence of the Company's growth from the largest importer and distributor of alcoholic beverages in Poland to the largest importer and distributor of alcoholic beverages and producer of vodka in that country, and the Company's recent entry into the importation and production of alcoholic beverages in Russia, Mr. Carey's job responsibilities expanded to include overseeing operations in multiple countries and additional business activities."

15.     Defendant Christopher Biedermann ("Biedermann") was, at all relevant times, Vice President and Chief Financial Officer of CEDC.  Biedermann joined the Company in January 2005 as Chief Financial Officer.  As noted in the Proxy, "Christopher Biedermann, as Chief Financial Officer, is directly responsible for the financial condition of the Company, and the complex, diverse accounting and financial reporting requirements the Company is subject to.  The expansion of our operations from exclusively importation and distribution to include production, and our acquisition of businesses operating in different territories and jurisdictions have increased Mr. Biedermann's responsibilities considerably."

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

16.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about CEDC.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of CEDC publicly traded securities was a success, as it: (i) deceived the investing public regarding CEDC's prospects and business; (ii) artificially inflated the price of CEDC publicly traded securities; and (iii) caused plaintiff and other members of the Class to purchase CEDC common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

17.     Defendant CEDC operates primarily in the alcohol beverage industry as one of the largest producer of vodka in the world and Central and Eastern Europe's largest integrated spirit beverages business, measured by total volume, with approximately 32.7 million nine-liter cases produced and distributed in 2010.  CEDC's primary operations are conducted in Poland, Russia and Hungary.  For the year ended December 31, 2010, the Polish and Russian operators account for 31% and 64.7% of revenues, respectively.

18.     In Poland, CEDC is one of the largest vodka producers with a brand portfolio that includes *Absolwent, Zubrowka, Bols, Palace* and *Soplica* brands, each of which is produced at CEDC's Polish distilleries. In addition, CEDC produces *Zubrowka Biala*, which has become one of the fastest growing brands in the Polish market since its launch in November 2010.

19.     CEDC is also the largest vodka producer in Russia, the world's largest vodka market. The *Green Mark* brand is the top-selling mainstream vodka in Russia and the second-largest vodka brand by volume in the world and the Company's *Parliament* and *Zhuravli* brands are two top-selling sub-premium vodkas in Russia.

20.     The Class Period commences on August 5, 2010.  On that date, CEDC issued a press release announcing its financial results for the second quarter of 2010, the period ended June 30, 2010.  For the quarter, the Company reported net sales of $175.6 million as compared to $175.9 million for the same period in the prior year, operating profit of $44.7 million, as compared to $36.3 million for 2009, and net income of $17.6 million, as compared to $16.2 million for the same period in the prior year.  In the press release, defendant Carey commented:

> "We have started to see more robust demand from the consumer in our largest market, Russia (which represents approximately 75% of our net income), our volumes were up 7.5% from vodka and imports from the Whitehall Group were up 14% in volume terms during the second quarter of 2010. The bulk of the growth in

demand for our vodka portfolio is still coming from a lower price point as compared to the second quarter 2009, but pricing seems to have stabilized and gross margins remain above 50% . We have also seen strong Parliament Vodka distribution gains, post integration, in the second quarter with Parliament [V]odka up 14% in volume. There has been continued strong interest from the vodka consumer in Russia for our new mainstream/economy brands that we launched last fall, and we are still realizing strong distribution gains for these brands over the last nine months. Our core economy brand, Yamskaya, is ranked as one of the fastest growing brands in Russia today and is expected to achieve over three million nine liter cases in 2010 (a 25% increase over 2009). Although the product mix has had a slight negative impact on our gross margin percentages this has been more than offset by a declining SG&A base resulting in our core operating profit as a percent of sales in Russia expanding by over 400 basis points over 2009 second quarter results."

In discussing the demand in Russia for CEDC vodka, defendant Carey stated:

"In Russia the overall vodka market has been positively impacted by strong government controls that have been put in to reduce the grey market. The controls that are taking place affect the producers of raw spirit, vodka manufacturers, retailers and wholesalers. We are still estimating that from the shift from grey market to legal market that the overall legal vodka market will grow this year with overall consumption including the grey market down approximately one to three percent. Based upon Gosstat data, the legal vodka market is up one percent for the six months ending June 30, 2010. We expect that the growth of the legal vodka market to [sic] come primarily from the value sector where people are shifting from the grey market, but as real wage inflation continues its positive trends we expect mainstream/sub-premium sectors to benefit medium term."

In discussing the demand in Poland for CEDC vodka, defendant Carey stated:

"The Polish consumer was hit with a number of external events that we believe had a significant impact on the Polish vodka market generally and our results. The quarter began with the tragic accident involving the death of the Polish President and other high ranking officials followed by a few weeks of mourning, massive flooding took place in the southern part of Poland and record high temperatures that began in June. Our vodka volumes for the quarter were down approximately 12% and were partially offset by increases in our import and export businesses. We were able to continue to reduce SG&A as a percent of sales on a comparable basis by over 100 basis points, translating into operating profit margins of over 50 basis points higher as compared to the prior year period. Management is extremely focused on improving the volume numbers in Poland and with a major launch of a new mainstream/subpremium vodka brand planned for the fourth quarter of this year and improved execution; we believe we are on track to deliver increased top line growth and a continued improvement in our operating profit margins."

21.     Defendant Biedermann in the release updated the Company's full year net sales guidance from $900-$1,050 million to $764-$914 million while keeping full year fully diluted EPS guidance unchanged at $2.10-$2.20 per share. He also noted that the Company was maintaining its full year guidance for operating profit, excluding depreciation of $262 million.

22.     That same day, CEDC held a conference call for analysts and investors to discuss the Company's earnings release and operations. During the call, defendants spoke positively about the Company's businesses and prospects.

23.     On August 9, 2010, CEDC filed with the SEC its Form 10-Q for the quarter ended June 30, 2010, which was signed by defendants Carey and Biedermann, and included representations about the Company's disclosure controls and defendants' certifications thereon.

24.     The statements referenced above in ¶¶20-23 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse material facts, which were known to defendants or recklessly disregarded by them:

        (a)     CEDC had double digit declines in its Vodka portfolio and its loss of market share in Poland was growing steeper as discounters were taking shares; and

        (b)     The seriousness in the market share declines required that CEDC take an impairment charge which defendants caused CEDC not to record on a timely basis.

25.     On November 5, 2010, CEDC announced its results for the third quarter of 2010. Net sales for the three months ended September 30, 2010 were $157.8 million as compared to $187.5 million reported for the same period in 2009. Operating profit on a comparable basis for the third quarter 2010 was $32.5 million as compared to $43.5 million for 2009. On a comparable basis, CEDC announced net income, excluding discontinued operations, of $8.5 million, or $0.12 per fully diluted share, for the third quarter of 2010, as compared to $27.2 million, or $0.49 per fully diluted

share, for the same period in 2009. CEDC also announced that net profit on a U.S. GAAP basis,

excluding discontinued operations, for the quarter was $68.9 million or $0.98 per fully diluted share,

as compared to a net profit of $45.4 million or $0.83 per fully diluted share, for the same period in

2009.  In the release defendant Carey commented on the quarter's results stating:

> "We were disappointed by the results in the 3rd quarter of 2010 which were a result
> of a combination of factors including external events, currency movements,
> commodity prices and negative sales mix that occurred in our core markets. After
> seeing solid volume growth coming from the 2nd quarter of 2010, we were expecting
> a continuation of these positive volume trends into the 3rd quarter. The expected
> positive trends from the 2nd quarter were heavily impacted by the record heat wave
> across Eastern Europe and fires which spread across key parts of Russia. These
> factors resulted in an estimated reduction in the vodka market in volume terms
> during this period by an estimated 6%-8% in Poland and 12%-15% in Russia as
> compared to the prior year. We were able to see strong volume and market trends in
> September; however, these trends were not sufficient to cover the shortfall for the
> first two months of the quarter."
>
> . . . "We have spent a lot of management time on restructuring, integration
> and cost reductions over the past fifteen months which have all contributed to the
> lowering of our operating overheads. The key objective for management on all levels
> is top line growth from our existing core portfolio, as well as new product
> development and new import agency business. This will be our primary focus over
> the next 24 months; kicking off next week with our biggest ever new product launch
> in Poland. In Russia, we have a pipeline of new products that will begin to enter the
> market early next year, not to mention our successful brandy launch last month. Our
> strategic aim is to grow profitable market share in Poland, Russia and Hungary
> through all segments."
>
> . . . "Over the last six months, we have seen continued improvement in
> consumer demand and sentiment in Russia as well as a positive outlook from a macro
> view in Russia. The imported market for wines and spirits in Russia is benefitting the
> most from these trends, with our year to date sales in Whitehall up over 15% year on
> year. This trend has also been confirmed by many multinational spirit companies
> who have reported strong brown spirit sales coming out of the Russian market. We
> believe these trends of strong imported wine and spirit sales in Russia will continue
> dynamically for the next few years. As stated last quarter, we are continuing the
> negotiation for an early buy out and controlling stake in the Whitehall Company
> which we anticipate could close in the near future."
>
> . . . "As we are now in our biggest quarter of the year in terms of revenue and
> profitability we are forecasting high single digit volume growth and double digit
> value growth (taking into account recent price increases) for this quarter from our

overall portfolio. We have seen a stabilization of commodity prices since September, and we believe we will continue to benefit from a much lower cost base this quarter and beyond. Although the 3rd quarter was a huge disappointment for us, our management team is extremely focused on delivering on these 4th quarter objectives, and we believe the worst is behind us."

26.     The release concluded with CEDC announcing that it had updated its full year 2010 net sales guidance from $764-$914 million to $730-$780 million and its full year comparable fully-diluted EPS guidance from $2.10-$2.20 to $1.50-$1.70. This revised guidance included exchange rates assumptions based upon recent market rates.

27.     That same day, CEDC held a conference call for analysts and investors to discuss the Company's earnings release and operations. During the call, defendants, while recognizing that they were "extremely disappointed on the results in Q3," spoke positively about the Company's businesses and prospects, stating, "certainly the opportunity in front of us is much more bright than what we've seen in the past three quarters." Defendant Carey emphasized that the steps they had taken – a new product launch, the doubling of the size of the sales force in terms of the development teams – "translates into positive Q4 top line growth."

28.     On November 9, 2010, CEDC filed with the SEC its Form 10-Q for the quarter ended September 30, 2010, which was signed by defendants Carey and Biedermann, and included representations about the Company's disclosure controls and defendants' certifications thereon.

29.     The statements referenced above in ¶¶25-28 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse material facts, which were known to defendants or recklessly disregarded by them:

        (a)     CEDC had double digit declines in its Vodka portfolio and its loss of market share in Poland was growing steeper as discounters were taking shares;

(b)      The seriousness in the market share declines required that CEDC take an impairment charge which defendants caused CEDC not to record on a timely basis; and

(c)      The launch of the new product, *Zubrowka Biala*, with significant market spending in the form of rebates, was having a materially adverse effect on gross margin and impacted the channel mix in the market.

30.      Then, five months later, CEDC announced its results for the full year 2010 in a press release dated March 1, 2011, surprising the market and reporting a net loss from continuing operations on a U.S. GAAP basis for the year of $92.9 million, or $1.32 per fully diluted share, as compared to a net profit of $72.7 million, or $1.35 per fully diluted share, for the same period in 2009. The Company reported net income from continuing operations of $38.7 million, or $0.55 per fully diluted share, for the full year 2010, as compared to $118.9 million, or $2.20 per fully diluted share, for the same period in 2009 and previous guidance of EPS from $2.10-$2.20 to $1.50-$1.70. The loss was due in part to an impairment charge.

31.      Following the full year earnings announcement, defendants held a conference call with analysts and investors, wherein defendants disclosed for the first time an excise tax issue in production in Russia, where they had a dispute with authorities on an old excise stamp count, which resulted in the loss of two weeks of limited production runs, with one week having nothing produced in the middle of November, their "key selling period." Defendants admitted that this had "hit our bottom line quite dramatically as we had to give extra discounts in the marketplace and a bit [of] extra credit days to make up for some of those [sic] lost period of time that we were affected," all of this resulting in a $35 million charge for the production issue.

32.      Additionally, during this conference call, defendants admitted they had double digit declines in their Vodka portfolio, mainly from discounters in key accounts taking shares, combined

with the launch of *Zubrowka Biala*, which they stated had "a negative implication on our bottom line, as the brand grew 2.5 times more than we estimated, and as we have put out the promotional plan in place [sic], we couldn't just turn off the spigot or reduce the plan as the brand was doing extremely well . . . it was running a negative comp. Certainly, also, it does cannibalize – the growth in this brand, it does cannibalize about 30% to 35% of our other portfolio." All of this resulted in a $131 million non-cash impairment charge because the fair value of the trademarks related to the *Absolwent* and *Bols* brands in Poland had deteriorated.

33.     In response to the unexpected earnings announcement, shares of the Company's stock fell $8.52, or more than 37%, to close at $14.33 per share, on extremely heavy trading volume.

34.     The market for CEDC securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, CEDC securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired CEDC securities relying upon the integrity of the market price of CEDC securities and market information relating to CEDC, and have been damaged thereby.

35.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of CEDC publicly traded securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

36.     At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about CEDC's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of CEDC and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's publicly traded securities at artificially inflated prices, thus causing the damages complained of herein.  When the true facts about the Company were revealed to the market the inflation in the price of CEDC stock was removed and the price of CEDC stock declined dramatically causing loss to plaintiff and the other members of the Class.

37.     The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were that the Company was presenting its financial statements in violation of GAAP, causing its financial results to be materially misstated.

38.     As a result of defendants' false statements, CEDC's common stock traded at artificially inflated levels during the Class Period.  After the above revelations seeped into the market, the price of CEDC common stock was hammered by massive sales, sending them down nearly 48% from their Class Period high of $27.44 per share on December 2, 2010.

## ADDITIONAL SCIENTER ALLEGATIONS

39.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in

the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding CEDC, their control over, and/or receipt and/or modification of CEDC's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning CEDC, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

40.     At all relevant times, the market for CEDC common stock was an efficient market for the following reasons, among others:

(a)     CEDC stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, CEDC filed periodic public reports with the SEC and the NASDAQ;

(c)     CEDC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     CEDC was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

41.     As a result of the foregoing, the market for CEDC common stock promptly digested current information regarding CEDC from all publicly available sources and reflected such

information in the price of CEDC common stock . Under these circumstances, all purchasers of CEDC common stock during the Class Period suffered similar injury through their purchase of CEDC common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

42.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of CEDC who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of CEDC during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, CEDC shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by CEDC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

46.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of CEDC; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

49.     Plaintiff incorporates ¶¶1-48 by reference.

50.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

51.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of CEDC common stock during the Class Period.

52.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CEDC common stock.  Plaintiff and the Class

would not have purchased CEDC common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

53.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of CEDC common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against All Defendants

54.     Plaintiff incorporates ¶¶1-53 by reference.

55.     The Individual Defendants acted as controlling persons of CEDC within the meaning of §20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of CEDC, and their ownership of CEDC stock, the Individual Defendants had the power and authority to cause CEDC to engage in the wrongful conduct complained of herein.  CEDC controlled each of the Individual Defendants and all of its employees.  By reason of such conduct, the Individual Defendants and CEDC are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  October 24, 2011                      LAW OFFICES BERNARD M. GROSS,     P.C
                                              DEBORAH R. GROSS


                                              _____
                                                        /s/ Tina Moukoulis
                                              TINA MOUKOULIS (TM-02698)
                                              DEBORAH R. GROSS

                                              The Wanamaker Building, Suite 450
                                              100 Penn Square East
                                              Philadelphia, PA 19107
                                              Telephone:  215/561-3600
                                              215/561-3000 (fax)

                                              ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                              SAMUEL H. RUDMAN
                                              58 South Service Road, Suite 200
                                              Melville, NY 11747
                                              Telephone:  631/367-7100
                                              631/367-1173 (fax)

                                              Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

STEAMFITTERS LOCAL 449 PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.    (a)    Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*In re Sturm, Ruger & Company, Inc. Sec. Litig.,* No. 3:09-cv-01293 (D. Conn.)

(b)    Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*Steamfitters Local 449 Pension Fund v. Travelzoo Inc.,*, No. 1:11-cv-06845 (S.D.N.Y.)

(c)    Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Steamfitters Local 449 Pension Fund v. Advanta Corp.* No. 2:09-cv-04730 (E.D. Pa.)
*Lenartz v. American Superconductor Corporation,* No. 1:11-cv-10582 (D. Mass.)

CENTRAL EUROPEAN

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 17ᵗʰ day of _October_, 2011.

STEAMFITTERS LOCAL 449 PENSION FUND

By: _____

Its: _____

- 2 -

CENTRAL EUROPEAN

SCHEDULE A

SECURITIES TRANSACTIONS

Acquisitions

| Date<br>Acquired | Type/Amount of<br>Securities Acquired | Price |
|---|---|---|
| 12/21/2010 | 1,085 | $23.49 |
| 12/22/2010 | 449 | $23.54 |
| 12/23/2010 | 843 | $23.61 |
| 01/11/2011 | 1,016 | $24.44 |