[Docs. No. 4, 9]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

STEAMFITTERS LOCAL 449 PENSION
FUND, Individually and on               Civil No. 11-6247-JBS-KMW
Behalf of All Others Similarly
Situated,

           Plaintiff,

     v.

CENTRAL EUROPEAN DISTRIBUTION
CORPORATION, et al.,

           Defendants.

TIM SCHULER, Individually and
on Behalf of All Others                 Civil No. 11-7085-JBS-KMW
Similarly Situated,

           Plaintiff,

     v.

CENTRAL EUROPEAN DISTRIBUTION
CORPORATION, et al.,

           Defendants.

## **Report and Recommendation**

BEFORE THE COURT are the following applications: (1) the
motion of the Arkansas Public Employees Retirement System
(hereafter, "APERS") and the Fresno County Employees' Retirement
Association (hereafter, "FCERA") (together, "Arkansas") for
appointment as lead plaintiff, appointment of lead counsel, and

1

consolidation of the related actions [Doc. No. 4]; and (2) the competing motion of the Prosperity Group for appointment as lead plaintiff, appointment of lead counsel, and consolidation of the related actions [Doc. No. 9]. Oral argument for the above motions was heard on March 27, 2012. For the reasons set forth below, and after considering the parties' supporting arguments, the Court respectfully recommends that Arkansas's motion be granted and the Prosperity Group's competing motion be denied.

## **Background**

These related actions are brought against Defendant Central European Distribution Company (hereafter, "CEDC") on behalf of a purported class of investors that purchased or otherwise acquired securities of CEDC between August 5, 2010 and February 28, 2011 (the "Class Period"). (See Complaint, Doc. No. 1). CEDC is a global business that operates primarily in the alcoholic beverage industry. See id.

Plaintiff Steamfitters Local 449 Pension Fund filed a complaint on behalf of a class of purchasers of CEDC stock on October 24, 2011. (See Complaint, Doc. No. 1). Notice of the action was published over the *Business Wire*, a company that distributes news to, inter alia, media sources, investors, and disclosure systems, to advise members of the proposed class of their right to move the Court to serve as lead plaintiffs no later than December 23, 2011. (See Prosperity's Br. in Support of Motion, Doc. No. 10, at *7). On November 15, 2011 plaintiff Tim

Schuler filed a second complaint on behalf of a class consisting of purchasers of the common stock of CEDC.   <u>Id.</u>

Two groups of investors, Arkansas and the Prosperity Group, have each filed competing motions seeking to: (1) consolidate the two cases; (2) be appointed as lead plaintiff; and (3) have their respective attorneys be appointed as lead counsel.  (<u>See</u> Docs. No. 4 & 9).

**Discussion**

**I.   CONSOLIDATION OF ACTIONS**

First, the Court will consider the motions to consolidate the two actions currently before this Court, <u>Steamfitters Local 449 Pension Fund v. CEDC</u>, Civil No. 11-6247, and <u>Schuler v. CEDC</u>, Civil No. 11-7085.[1]   The district court has broad discretion to consolidate actions under the Federal Rules of Civil Procedure, and pursuant to Rule 42(a):

> When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all of the matters in issue in the action; it

---

1.  A motion for consolidation should be considered by the district court before deciding motions for the appointment of lead plaintiff.  15 U.S.C. § 78(u)-4(a)(3)(B)(ii) ("[...] the court shall not make the determination required by clause (I) until after the decision on the motion for consolidation is rendered.  As soon as practicable after such decision is rendered, the court shall appoint the most adequate plaintiff as lead plaintiff for the consolidated actions  [...]"); <u>see also</u> <u>In re Sterling Fin. Corp. Sec. Class Action</u>, 2007 U.S. Dist. LEXIS 93708, at *7.

> may order all the actions consolidated; and it
> may make such order concerning proceedings
> therein as may tend to avoid unnecessary costs
> or delay.

Fed. R. Civ. P. 42(a); see also Nanavati v. Burdette Tomlin Memorial Hosp., 857 F.2d 96, 103 n.3 (3d Cir. 1988) (finding that consolidation is appropriate where there are actions involving common questions of law or fact). Furthermore, the Private Securities Litigation Reform Act of 1995 ("PSLRA") also allows for consolidation of securities class actions involving the same facts and legal issues. 15 U.S.C. § 78(u)-4(a)(3)(B)(ii); see, e.g., In re Sterling Fin. Corp. Sec. Class Action, 2007 U.S. Dist. LEXIS 93708 (E.D. Pa. Dec. 21, 2007).

Pursuant to the PSLRA and Rule 42, pending suits need not be identical in order to be consolidated. Rather, "in deciding whether to consolidate actions under Rule 42(a), the court must balance the risk of prejudice and possible confusion against the risk of inconsistent adjudications of common factual and legal issues, the burden on the parties and witnesses, the length of time required to conclude multiple lawsuits as against a single one, and the relative expense to all concerned of the single-trial and multiple-trial alternatives." A.F.I.K. Holding SPRL v. Fass, 216 F.R.D. 567, 570 (D.N.J. 2003) (citing In re Consolidated Parlodel Litig., 182 F.R.D. 441, 444 (D.N.J. 1998); Chill v. Green Tree Financial Corp., 181 F.R.D. 398, 405 (D.Minn. 1998); Takeda v.

4

Turbodyne Technologies, Inc., 67 F. Supp. 2d 1129, 1133 (C.D.Ca. 1999)).  If there is no articulated basis to assert confusion or prejudice, consolidation is generally appropriate.  See, e.g., A.F.I.K. Holding SPRL v. Fass, 216 F.R.D. at 570; In re Lucent Techs. Sec. Litig., 221 F. Supp. 2d 472, 480 (D.N.J. 2001).

The related securities class actions before this Court, Steamfitters Local 449 Pension Fund v. CEDC, Civil No. 11-6247, and Schuler v. CEDC, Civil No. 11-7085, contain the same factual and legal issues.  Both actions allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 as amended by the PSLRA, and make identical claims against the same defendant for the same actions during the same period of time.  (See Steamfitters Complaint, Doc. No. 1, Civil No. 11-6247; Schuler Complaint, Doc. No. 1 Civil No. 11-7085).  Thus, maintaining separate actions may result in the waste of judicial resources and create administrative confusion for both the court and the parties.  See, e.g., In re Sterling Fin. Corp. Sec. Class Action, 2007 U.S. Dist. LEXIS 93708, at *7; A.F.I.K. Holding SPRL v. Fass, 216 F.R.D. at 570; Fields v. Biomatrix, Inc., 198 F.R.D. 451, 454 (D.N.J. 2000).  Considering all of the above, the Court finds that consolidation of the actions pursuant to Rule 42(a) would facilitate the administration of justice and promote judicial economy, and would not result in the creation of any foreseeable prejudice.  See id.; see also Fed. R. Civ. P. 42(a).  Accordingly, the Court recommends that the related actions, Steamfitters Local 449 Pension Fund v. CEDC, Civil No. 11-

6247, and Schuler v. CEDC, Civil No. 11-7085, be consolidated pursuant to Fed. R. Civ. P. 42(a), and henceforth be captioned In re Steamfitters Local 449 Pension Fund Securities Litigation.

## II.  APPOINTMENT AS LEAD PLAINTIFF

Next, the Court will address the parties' competing motions for appointment as lead plaintiff.  The various arguments raised by the parties in support of their respective positions can be divided into two categories for the Court's consideration:  (1) arguments related to Article III standing; and (2) arguments related to the Private Securities Litigation Reform Act of 1995 ("PSLRA").  The Court will address each of these arguments in turn.

### A. Article III Standing

Review of standing is a threshold inquiry.  Hassine v. Jeffes, 846 F.2d 169, 176 (3d Cir. 1988) (citing O'Shea v. Littleton, 414 U.S. 488, 494 (1974)).  Thus, before considering arguments related to the PSLRA it must first be determined whether the Prosperity Group has standing under Article III of the United States Constitution to pursue securities claims on behalf of the class.[2] See Warth v. Seldin, 422 U.S. 490, 498 (1975).  If the Court ultimately determines that the Prosperity Group does not have standing to bring suit in this matter, the Prosperity Group's arguments in support of its request to be appointed as lead

2.  Standing issues are typically addressed before other issues that go to the merits of a case, as a lack of standing strips a court of jurisdiction.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88-89 (1998).

plaintiff need not be considered.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. at 88-89.

Under Article III, a federal court has jurisdiction to hear a complaint only if there is an actual case or controversy.  In order to satisfy constitutional standing requirements, a plaintiff must show that: (1) he has suffered an "injury in fact"; (2) there is a causal connection between his injury and the alleged conduct; and (3) it is likely that his injury "will be redressed by a favorable decision."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  Arkansas challenges the Prosperity Group's standing based on the first element, asserting that the Prosperity Group cannot satisfy the "injury in fact" requirement due to its purported leadership structure.  (See Arkansas's Br. in Opp. to Competing Motion, at *4, Doc. No. 22).

The Prosperity Group is comprised of nine separate legal entities, with Prosperity Capital Management Limited ("PCM"), an investment manager, positioned at the top of the Group's internal hierarchy.  Id.  PCM manages four funds: the Russian Prosperity Fund, the Prosperity Cub Fund, the Prosperity Quest Fund, and the Prosperity Russia Domestic Fund Limited (collectively, "the Funds").  Id.  Each of these aforementioned Funds, in turn, have their own individual subsidiary:  Protsvetaniye Holdings Limited, Medvezhonok Holdings Limited, Lancrenan Investments Limited, and Roselia Limited (collectively, "the Subsidiaries").  Id.  Thus, PCM, the Funds, and the Subsidiaries constitute the "Prosperity

Group" as a whole.  Id.

The Subsidiaries are the only entities within the Prosperity Group that actually hold title to the CEDC securities that are at the center of this case.  (See Transcript of March 27, 2012, Oral Argument, at *29-31, Doc. No. 34)  As such, the Subsidiaries are also the only entities within the Prosperity Group that hold title to claims arising from those securities.  Id.  It should also be noted that while the Subsidiaries have authorized PCM to act on their behalf to pursue claims that arise from the CEDC securities at issue in this matter, they have not assigned the title to said claims to PCM or any other entity within the Prosperity Group.  Id.

According to Arkansas, the leadership structure of the Prosperity Group precludes constitutional standing because the Subsidiaries have "merely delegated authority" to pursue claims arising from the CEDC securities at issue to PCM, and therefore PCM cannot satisfy the "injury in fact" requirement of constitutional standing.  (See Arkansas's Br. in Opp. to Competing Motion, at *4, Doc. No. 22).  Arkansas argues that in order for an investment adviser like PCM to have standing it must not only have authorization to bring a lawsuit, but also some proprietary interest in the claims that they are litigating.[3]  See id.  In the

_____

3.  The legal basis for Arkansas's argument regarding the Article III standing requirements for investment advisers in securities class action lawsuits is the Second Circuit decision in W.R. Huff Asset Management Co. v. Deloitte & Touche, 549 F.3d 100 (2nd Cir. 2008).  The Huff court held that, in light of the Supreme Court decision in Sprint Communications Co. v. APCC Services, 128 S. Ct. 2531 (2008), an investment adviser must obtain an assignment

context of securities class action lawsuits, an investment adviser
may obtain such a proprietary interest through an assignment of
title to claims arising from the underlying securities at issue in
a litigation.  See id.

The factual basis for Arkansas's assertions regarding PCM's
lack of standing is found in the certification of Oliver J. Sinton,
the managing director of PCM. (See Prosperity Group's Exhibit B,
Doc. No. 10).  Paragraph No. 9 of the certification reads as
follows:

> Each of the PCM Managed Funds and the PCM
> Managed Funds' Subsidiaries *has authorized*
> *PCM, in its capacity as its discretionary*
> *investment manager, and any person appointed*
> *by PCM, actively to pursue on its behalf all*
> *rights, title and interests in any claims,*
> *demands or causes of action arising from the*
> *purchases of CEDC common stock* including, for
> the avoidance of doubt, full authority to
> negotiate and agree a settlement in this

---

of its clients' claims in order to satisfy the "injury in fact"
requirement of constitutional standing.  See Huff, 549 F.3d 108
("Sprint makes clear that the minimum requirement for injury-in-
fact is that the plaintiff have legal title to, or a property
interest in, the claim. [...] Sprint therefore implicitly
supports [that] a mere power-of-attorney--i.e., an instrument
that authorizes the grantee to act as an agent or an attorney-in-
fact for the grantor, [...] does not confer standing to sue in
the holder's own right because a power-of-attorney does not
confer an ownership interest in the claim").

> matter, and has duly authorized PCM to
> institute all appropriate legal actions on its
> behalf. I, Oliver J. Sinton, as managing
> director of PCM, have day-to-day
> responsibility for conduct of this matter on
> behalf of PCM [emphasis added].

Id. at ¶9. Arkansas argues that Mr. Sinton's certification plainly indicates that only the authority to pursue claims arising from the CEDC securities has been delegated to PCM; title to those claims still rests with the Subsidiaries. (See Arkansas's Br. in Opp. to Competing Motion, at *4, Doc. No. 22). The result, according to Arkansas, is that PCM has authority to prosecute claims that it does not hold title to, while the Subsidiaries hold title to claims that they no longer have the authority to pursue. See id. Accordingly, Arkansas asserts that no single entity within the Prosperity Group holds both title to claims arising from the CEDC securities and the authority to pursue those claims, and thus the structure of the group as a whole is defective for the purpose of satisfying the injury-in-fact requirement of Article III standing. (See Arkansas's Br. in Supp., at *4, Doc. No. 32).

On the other hand, the Prosperity Group contends that PCM has standing to bring suit on behalf of the Prosperity Group, and notes that the majority of district courts in the Third Circuit have held that an investment adviser like PCM has standing to assert claims on behalf of its investor clients so long as it has been given

discretionary authority and power of attorney.  (See The Prosperity Group's Br. in Supp. of Motion, at *5, Doc. No. 33) (citing Marsden v. Select Med. Corp., 246 F.R.D. 480, 486 (E.D. Pa. 2007); In re Able Labs. Sec. Litig., 425 F. Supp. 2d 562, 571 (D.N.J. 2006); In re DaimlerChrysler AG Sec. Litig., 216 F.R.D. 291, 299 (D. Del. 2003); Roth v. Knight Trading Group, Inc., 228 F. Supp. 2d 524, 529 (D.N.J. 2002); Ezra Charitable Trust v. Rent-Way, Inc., 136 F. Supp. 2d 435, 442 (W.D. Pa. 2001); In re Rent-Way Sec. Litig., 218 F.R.D. 101 (W.D. Pa. 2003)).  Pursuant to the standard for investment adviser standing set forth in the third circuit cases cited by the Prosperity Group, PCM would clearly have standing to pursue claims on behalf of the Subsidiaries.  See id.  Accordingly, the Prosperity Group argues that this Court should follow the "majority rule" in the third circuit, rather than follow the Second Circuit's opinion in Huff.  Id.  Furthermore, the Prosperity Group argues that even if this Court should choose to follow Huff and determine that PCM does not have standing, the Funds and Subsidiaries would still have standing to assert the claims and therefore should be appointed lead plaintiff.  (See Prosperity Group's Br. in Supp. of Motion, at FN3, Doc. No. 10).

The issue of whether investment advisers have Article III standing to pursue claims on behalf of their clients has recently garnered renewed scrutiny in light of Sprint and Huff.  See Sprint Communications Co., 128 S. Ct. 2531; W.R. Huff Asset Management Co., 549 F.3d 100.  Prior to Sprint and Huff, courts routinely held

11

that investment advisers had standing to pursue claims on behalf of their clients so long as they possessed power of attorney and full discretionary authority to make investment decisions; an assignment of their clients' claims was not necessary.  See, e.g., In re Able Labs. Sec. Litig., 425 F. Supp. 2d 562, 571.  In Sprint, the Supreme Court held that an assignee that holds legal title to an injured party's claim has constitutional standing to pursue that claim, even if the assignee has agreed to remit all proceeds from the litigation to the assignor.  128 S. Ct. at 2533.  The Court determined that such assignees, despite not having suffered a direct injury, nevertheless satisfy the "injury in fact" requirement for constitutional standing, as the assignment also transferred the assignor's claims for injuries.  Sprint, 128 S. Ct. at 2542.  The Supreme Court's holding in Sprint stemmed from the "historical practice of federal courts that permitted assignees to bring suits in their own right when they were assigned title for the sole purpose of collection."  128 S. Ct. at 2537-41.

The Second Circuit in Huff, applying Sprint, determined that a plaintiff investment adviser attempting to bring suit on behalf of its client must have legal title to, or a property interest in, its client's claim in order to satisfy the minimum requirement for injury-in-fact.  Huff, 549 F.3d at 108.  Thus, the Second Circuit held that an investment adviser could not pursue claims on behalf of its clients unless it had legal title to or a property interest in those claims, even if the adviser had power of attorney and full

12

discretionary authority to make investment decisions for its clients. Id. Finding that the plaintiff investment adviser did not have legal title to or ownership of its clients' claims, the Second Circuit held that the investment adviser in Huff lacked Article III standing. Id.

The Third Circuit has not yet addressed the question of whether investment advisers have Article III standing to pursue claims on behalf of their clients in the wake of Sprint. As the Prosperity Group has noted in its submissions, other district courts in this circuit have traditionally allowed investment advisers and managers to serve as lead plaintiffs in class action suits. See, e.g., Marsden, 246 F.R.D. at 486 (holding an investment manager with authorization that is the clients' attorney-in-fact has standing to bring securities claims); In re Able Labs Sec. Litig., 425 F. Supp. 2d at 571 (allowing plaintiff with power of attorney and discretionary authority to serve as lead plaintiff); In re DaimlerChrysler AG Sec. Litig., 216 F.R.D. at 299 (noting that investment advisers with authority to make investment decisions for their clients are "purchasers" for purposes of securities laws such that they have standing); Roth, 228 F. Supp. 2d 524 (holding that plaintiff's status as an investment adviser does not prevent it from serving as lead plaintiff); Ezra Charitable Trust, 136 F. Supp. 2d 435 (holding an investment manager with full discretionary authority to purchase securities for its clients was a "purchaser" pursuant to the Exchange Act); In

13

re Rent-Way Sec. Litig., 218 F.R.D. 101 (finding that lead plaintiff's role as an attorney-in-fact conferred standing even if documentary evidence lacked language explicitly stating that the investment manager had power of attorney for its clients). However, it is important to acknowledge that the majority of district court decisions in this circuit that have considered this standing issue were published prior to the Second Circuit's decision in Huff. See id. Most recently, the issue of an investment adviser's standing to pursue claims on behalf of its clients was considered by the court in In re Herley Indus. Inc. Sec. Litig., a securities class action case from the Eastern District of Pennsylvania that, like the instant matter, featured competing motions for appointment as lead plaintiff. 2009 U.S. Dist. LEXIS 91600, at *16 (E.D.Pa. Sept. 30, 2009)

In re Herley warrants acute consideration, as the court directly addressed Sprint and Huff, and the ramifications those cases may have for class action securities lawsuits in this circuit. See id. As the court in Herley noted, nearly all of the decisions in this circuit that have allowed an investment adviser to serve as lead plaintiff were issued prior to the Second Circuit's opinion in Huff,[4] and were based on an analysis of Rule 23 and relevant provisions of the PSLRA. Id. at *17. The court in

---

4. One court that did allow an investment adviser to serve as lead plaintiff after the Second Circuit's decision in Huff, Dutton v. Harris Stratex Networks, Inc., 2009 U.S. Dist. LEXIS 48455 (D. Del. June 5, 2009), did not cite Huff or consider what impact the Huff decision may have had on the court's decision.

14

Herley ultimately found the Huff court's reasoning persuasive, and, like the Second Circuit in Huff, determined that the Supreme Court decision in Sprint suggested that investment advisers seeking to serve as plaintiffs must now have legal title to, or a proprietary interest in, the claims they are pursuing.  Id. at *18. Accordingly, the Herley court found that Huff "altered the legal landscape of investment adviser standing," and subsequently determined that an investment adviser seeking to serve as lead plaintiff in a class action securities case without a proprietary interest in the claims it is pursuing must obtain an assignment of claims in order to satisfy the standing requirements of Article III.[5]  Id.  ("[Plaintiff] has alleged no cognizable injury to itself; it has merely demonstrated it has discretionary investment authority and acts as the underlying funds' attorney-in-fact.  This status alone does not endow [plaintiff] with standing [...]").

---

5.  The Herley court also noted that, outside the class action context, Rule 17 cannot generally be used to cure defects in standing extant at the outset of litigation.  2009 U.S. Dist. LEXIS 91600, at *24-26; see also Fed. R. Civ. P. 17.  Thus, a post-filing assignment of legal rights will not cure a prospective plaintiff's defective Article III standing.  Id. However, despite the fact that the lead plaintiff in Herley, Galleon Management, did not have standing at the inception of litigation, the court permitted it to continue as lead plaintiff pursuant to Rule 17 in light of circumstances unique to that case.  2009 U.S. Dist. LEXIS 91600, at *31, FN11.  Specifically, the court noted that its determination that Galleon had standing on account of a post-filing assignment was the result of the singular occurrence of Galleon having already been appointed lead plaintiff two years prior to the Second Circuit's decision in Huff.  Id.  In doing so, the Herley court opined that "plaintiffs filing suit after Huff have the benefit of its standing analysis."  Id.

This Court also agrees with the Huff court's interpretation of Sprint, and the effect of those decisions with regard to class action securities litigation as espoused in Herley. See Sprint Commc'ns, 128 S. Ct. 2531; Huff, 549 F.3d at 108; In re Herley, 2009 U.S. Dist. LEXIS 91600, at *18. While district courts in this circuit may have traditionally permitted investment advisers with discretionary authority to pursue claims on behalf of their clients, recent decisions outside this circuit have altered the landscape of class action securities litigation. See, e.g., Marsden, 246 F.R.D. at 486; In re Herley, 2009 U.S. Dist. LEXIS 91600, *18. Specifically, in light of Sprint and the Second Circuit's decision in Huff, it is this Court's determination that plaintiffs must have legal title to, or some type of proprietary interest in, the claim they are litigating in order to satisfy the minimum requirement for injury-in-fact. In re Herley, 2009 U.S. Dist. LEXIS 91600, *18 (citing Sprint Commc'ns, 128 S. Ct. 2531); see also Huff, 549 F.3d at 108. Therefore, for the purpose of evaluating an investment adviser's ability to satisfy the Article III requirements for constitutional standing, merely enjoying the authorization to pursue claims on behalf of investment clients will no longer suffice. See id.

In the instant matter, PCM has not alleged that it has suffered any cognizable injury. (See The Prosperity Group's Br. in Supp. of Motion, Doc. No. 33). Rather, PCM has merely demonstrated that it enjoys full authority to make investment decisions and

pursue legal action on behalf of the Subsidiaries, the entities in the Prosperity Group which actually hold title to the securities at issue in this litigation.  See id.  Accordingly, this Court must conclude that, in the absence of any post-filing assignment of claims, PCM cannot satisfy the injury-in-fact requirement for Article III standing pursuant to Sprint and Huff.  See Sprint Commc'ns, 128 S. Ct. 2531; Huff, 549 F.3d at 108; see also In re Herley, 2009 U.S. Dist. LEXIS 91600, *18.

Furthermore, the Court is not persuaded by the Prosperity Group's assertion that even if PCM does not have standing, the Funds and Subsidiaries do and ought to be appointed Lead Plaintiff. (See The Prosperity Group's Br. in Supp. of Motion, at *6, Doc. No. 33).  It is apparent from the submissions of the parties and counsel's oral arguments during the March 27, 2012 hearing that the Funds do not have title to the claims at issue in this litigation nor the authority to sue.  (See Transcript of March 27, 2012 Oral Argument, at *29-30, Doc. No. 34, Civil No. 11-7085).  Indeed, while it is undisputed that the Subsidiaries can satisfy the injury-in-fact requirement of Article III standing, the Court acknowledges that Mr. Sinton's certification appears to indicate that the Subsidiaries have delegated their power to sue to PCM. (See Prosperity Group's Exhibit B, Doc. No. 10).  Because PCM and the Funds do not have Article III standing, and the Subsidiaries have apparently delegated their ability to sue to PCM, the Court finds that the Prosperity Group, as a whole, cannot satisfy the

17

Article III constitutional requirements of standing.[6]

**B.   PSLRA**

Even if the Prosperity Group did not lack Article III standing, it would nevertheless fail to attain the Lead Plaintiff designation under the scrutiny required by the PSLRA.[7]  The PSLRA governs the appointment of a lead plaintiff in each private action arising under the Securities Exchange Act that is brought as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  See 15 U.S.C. § 78u-4(a)(1) and (a)(3)(B)(I); Fed. R.

---

6.  The Court will refrain from making any conclusive determination regarding whether the Subsidiaries' delegation to PCM of the authority to sue subsequently precludes the Subsidiaries from the ability to bring a claim against CEDC. To do so would likely require a detailed discussion of the fundamentals of agency law, as well as close scrutiny of relevant documentation regarding the legal relationship between PCM and the Subsidiaries.  For the purpose of deciding the competing motions for appointment as lead plaintiff, it is this Court's determination that PCM's and the Funds' clear lack of standing is a sufficient basis to find that the Prosperity Group, as a whole, lacks Article III standing.  Permitting the Prosperity Group to modify its leadership structure or composition at this stage would be akin to permitting a post-filing assignment for the purpose of curing deficient standing, a course of action explicitly advised against in Herley.  2009 U.S. Dist. LEXIS 91600, at *24-26.

7.  Enactment of the PSLRA does not affect the Court's constitutional standing analysis.  This is because while Congress may create new substantive rights, it cannot circumvent the "case or controversy" requirement of Article III, nor authorize someone whose substantive rights have not been invaded to pursue claims on behalf of someone else's substantive rights.  See Linda R.S. v. Richard D., 410 U.S. 614, 617 n.10 (1973) ("Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute."); In re Herley, 2009 U.S. Dist. LEXIS 91600, at *13 (citing Village of Bellwood v. Dwivedi, 895 F.2d 1521 (7th Cir. 1990)).

Civ. P. 23.  Pursuant to the process delineated in the PSLRA, the Court must select "the most adequate plaintiff" to serve as lead plaintiff, who may then, subject to the Court's approval, select and retain lead counsel to represent the class.  See, e.g., In re Cendant Corp. Litig., 264 F.3d 201, 262-67 (3d Cir. 2001); Montaya v. Herley Indus. Inc., 2006 U.S. Dist. LEXIS 83343, at *3 (E.D.Pa. Nov. 14, 2006) (citing 15 U.S.C. §§ 78u-4(a)(3)(B)(ii) and (v)). Under the PSLRA the presumptively most adequate plaintiff is the person who:

> (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(I);
>
> (bb) in the determination of the court, has the largest financial interest in relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  However, this presumption may be rebutted by a member of the purported plaintiff class upon proof that the presumptively most adequate plaintiff:

> (aa) will not fairly and adequately protect the interests of the class; or
>
> (bb) is subject to unique defenses that render such plaintiff incapable of adequately

19

representing the class.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).[8]

In practice, the aforementioned terms of the PSLRA require a court to first determine whether the movant with the largest financial loss has made a *prima facie* showing of typicality and adequacy so that it "otherwise satisfies" Rule 23.  See In re Cendant, 264 F.3d at 263.  In making this determination, a court may consider the pleadings that have been filed, the movant's application, and any other information that the court requires for submission.  Id. at 264.  Once a *prima facie* showing of typicality and adequacy has been made, there is a rebuttable presumption that the movant will serve as the lead plaintiff.  Id.  Accordingly, arguments of other plaintiff class members regarding why the movant

---

8.  The Third Circuit noted in In re Cendant Corp. Litig., 264 F.3d at 263, that the draftsmanship of 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) is "inartful and hence problematic."  This is because the provision of the Reform Act that deals with triggering the presumption, 15. U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc), "seems quite clear that a court must ensure that a movant satisfies both the typicality and adequacy requirements of Rule 23 before conferring upon that movant the status of presumptive lead plaintiff."  Id. at 263.  This conclusion appears to contradict the second subsection, 15. U.S.C. § 78u-4(a)(3)(B)(iii)(II), "which seems to establish that the only way to rebut the presumption is to show that the presumptive lead plaintiff does not satisfy the typicality and/or adequacy requirements."  Id.  Because the statute appears to make "typicality" and "adequacy" both part of identifying the presumptive lead plaintiff and the sole means of rebutting the lead plaintiff presumption, the Third Circuit noted that there appears to be an incongruous result whereby, "if the requirements of the first subsection are met, the statute can be read to say that the requirements of the second subsection are moot."  Id. In light of the above, this Court will follow the presumption and rebuttal analysis set forth in In re Cendant Corp. Litig., 264 F.3d at 263-64.

with the largest financial losses does not otherwise satisfy Rule 23 are to be considered for the purpose of determining whether the presumption has been rebutted, and not by the court in the initial, *prima facie* inquiry.  Id. at 263-64.

The court's initial inquiry regarding whether the movant with the largest losses satisfies the typicality and adequacy requirements need not be extensive.  Id. at 264.  Courts should apply traditional Rule 23 principles in making a typicality determination, and accordingly consider whether the circumstances of the movant with the largest losses "are markedly different or the legal theory upon which the claims [of that movant] are based differ from that upon which the claims of other class members will perforce be based."  Id. at 265 (quoting Hassine v. Jeffes, 846 F.2d 169, 177 (3d Cir. 1988).  In determining whether the movant satisfies Rule 23's adequacy requirements, courts ought to consider whether it has the ability and incentive to represent the claims of the class vigorously, whether it has obtained adequate counsel, and whether there is a conflict between the movant's claims and those asserted on behalf of the class.[9]  Id.  Finally, courts should also

---

9.  In making the initial adequacy assessment, courts should also consider two additional factors.  See In re Cendant, 264 F.3d at 265.  The first of these additional factors is whether the movant has demonstrated a willingness and ability to select competent class counsel and to negotiate a reasonable retainer agreement with that counsel.  The second additional factor that a court should consider in making a threshold adequacy determination will arise only when the movant with the largest losses is a group rather than an individual person or entity.  Id.  Pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I), a group of persons is permitted to serve as lead plaintiff.  However if a court should determine

consider whether a movant group is too large to function effectively, and with regard to this last consideration the Third Circuit has advised that courts should "generally presume that groups with more than five members are too large to work effectively." See id. at 267.

Once the presumptive lead plaintiff has been located, the court should determine whether the presumption has been rebutted. Id. at 268. Pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II), the presumption may only be rebutted upon proof by a member of the purported plaintiff class that "the presumptively most adequate plaintiff (aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." Thus, only class members may seek to rebut the presumption, and once the presumption is triggered, the operative question with regard to rebuttal is whether "anyone can prove that the presumptive lead plaintiff will not do a 'fair and adequate' job." See id. If no class member succeeds in rebutting the presumption, then the district court should appoint the presumptive lead plaintiff as the lead plaintiff. Id. Otherwise, the court must repeat the process until a lead plaintiff is selected. Id.

Here, it is clear that the Prosperity Group is the movant with

---

that "the way in which a movant group was formed or the manner in which it is constituted would preclude it from fulfilling the tasks assigned to a lead plaintiff, the court should disqualify that movant on the grounds that it will not fairly and adequately represent the interests of the class." Id.

22

the largest financial interest in this litigation.  The Prosperity Group allegedly purchased over 1.1 million shares of CEDC common stock and suffered losses of over $12 million, whereas Arkansas suffered losses of approximately $1.2 million from their purchase of CEDC shares.  (See Arkansas's Br. in Supp. of Motion, Doc. No. 5; Prosperity's Br. in Supp. of Motion, Doc. No. 10).  Considering the submissions of the Prosperity Group in accordance with 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I), it is this Court's determination that the Prosperity Group's claims are typical of the proposed class, as they arise from the same course of conduct by Defendants that gives rise to the other class members' claims, and are based on the same legal theories.  Moreover, the Prosperity Group's adequacy also appears satisfactory by that same standard.  See 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  Thus, if the Court were to disregard the previously discussed issues related to Article III standing, the Prosperity Group would have made a *prima facie* showing of "typicality" and "adequacy" pursuant to the analysis required by Rule 23, and would therefore qualify as the presumptive lead plaintiff.  See 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  However, for the reasons that follow, the Court finds that Arkansas has successfully rebutted any presumption in favor the Prosperity Group.

The presumption in favor of a lead plaintiff may be rebutted upon proof by a member of the purported class that the presumptive lead plaintiff will not fairly or adequately protect the interests

23

of the class or is subject to unique defenses.  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).  It is important to note that the presumption of most adequate plaintiff may be rebutted only upon "proof," and that mere speculation is not sufficient.[10]  See In re Cendant Corp. Litig., 264 F.3d at 264; Montoya v. Herley Indus., 2006 U.S. Dist. LEXIS 83343, at *6 (E.D. Pa. Nov. 14, 2006).  Bearing this standard in mind, in this Report and Recommendation the Court will only address arguments pertaining to standing, as those arguments are supported with requisite proof.

Both parties in this matter have directed the Court's attention to a recent district court decision, In re Netflix, Inc.,

---

10.  In the instant matter, Arkansas has raised a number of arguments regarding rebuttal evidence related to, inter alia, the Prosperity Group's standing and size, as well as PCM's alleged ownership stakes in various Russian vodka retailers.  (See Arkansas's Br. in Opp. to Motion, Doc. No. 22).  However, the Court is not persuaded by Arkansas's arguments concerning the size of the Prosperity Group.  While the Third Circuit has found that groups composed of more than five entities are presumptively too large to work effectively, this presumption does not apply to groups composed of close knit, cohesive investors such as the Prosperity Group.  See In re Cendant Corp. Litig., 264 F.3d at 267 (advising that courts should proceed with caution when considering groups composed of more than five members for appointment as lead plaintiff, as such groups are often composed of unrelated entities "cobbled together" by lawyers in an effort to create a movant with the largest financial interest in a given litigation).  Likewise, it is the determination of this Court that Arkansas has not presented adequate proof to substantiate its allegations concerning PCM's interests in and relationships with various Russian vodka retailers.  See 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).  Here, Arkansas has merely alleged that various Prosperity Group executives have business relationships with Russian grocery retailers, and such allegations do not satisfy the "proof" standard for rebuttal evidence articulated in In re Cendant Corp. Litig., 264 F.3d at 264.  (See Arkansas's Br. in Opp., at *6, Doc. No. 32).

24

<u>Sec. Litig.</u>, 2012 U.S. Dist. LEXIS 59465 (N.D. Cal. Apr. 26, 2012), in support of their respective positions.  (<u>See</u> Docs. No. 35, 36, 37).  The court in <u>Netflix</u> considered two competing motions for appointment as lead plaintiff and discussed standing issues similar to those present in the matter at bar.  <u>See id.</u>  One of the movants in <u>Netflix</u> was a group that consisted of three individual investors whose losses the court declined to aggregate due to the members having no relationship with one another prior to the commencement of litigation.[11]  <u>Id.</u> at *14-17.  However, the <u>Netflix</u> court found that even if it were to aggregate the group members' losses, the group would still not satisfy the PSLRA's requirement that lead plaintiffs be subject to no "unique defenses."  <u>See id.</u> at *17; U.S.C. § 78u-4(a)(3)(B)(iii)(II).  This is because the court found that there was a substantial likelihood that a unique defense could be raised against a member of the group, as one of the group

---

11. Courts in both the Ninth and Third Circuits have refused to aggregate the losses of individual, unrelated investors that share no connection aside from their counsel.  <u>See In re Cendant Corp. Litig.</u>, 264 F.3d 201, 267 (3d Cir. 2001) ("if, for example, a court were to determine that the [...] movant with the largest losses had been created by the efforts of lawyers hoping to ensure their eventual appointment as lead counsel, it could well conclude, based on this history, that the member [...] could not be counted to monitor counsel in a sufficient manner"); <u>In re Netflix, Inc., Sec., Litig.</u>, 2012 U.S. Dist. LEXIS 59465, at *14-15 (citing <u>In re Network Assocs., Sec. Litig.</u>, 76 F. Supp. 2d 1017, 1019-27 (N.D. Cal. 1999) (noting that courts in the Ninth Circuit "uniformly refuse to aggregate the losses of individual investors with no apparent connection to each other aside from their counsel").  However, it should be noted that the PSLRA does not explicitly mandate that members of a group be "related" in some manner; all that is required is that the movant group "fairly and adequately protect the interests of the class."  <u>See In re Cendant</u>, 264 F.3d at 267.

members was not the actual legal entity that held the account on which her losses were based. See id. at *18. In making this finding, the court noted that it need only determine whether it is substantially likely that the group, and hence the putative class, could be forced to litigate against defenses arising from the aforementioned group member's standing.[12] Id. ("Comstock's presence among the Fish Group could subject the class to the burden of litigation focused on her standing"). Whether the defense would be valid was inconsequential to the court's ruling. See id.

Arkansas argues that the instant matter is analogous to Netflix, as there is a substantial likelihood that PCM and the Funds would be subject to a unique defense, lack of Article III standing, thereby precluding the Prosperity Group, as a whole, from satisfying the PSLRA's typicality requirement. (See Arkansas's Br. in Opp. to Competing Motion, at *4, Doc. No. 22); In re Netflix, Inc., Sec., Litig., 2012 U.S. Dist. LEXIS 59465, at *18. As stated earlier, PCM has the authority to bring claims on behalf of the Subsidiaries but does not have title to, or a proprietary interest in, the claims arising from the securities at issue in this matter. See id. Similarly, the Funds have neither title to the claims in this action nor the authority to sue. See id. Pursuant to Huff

---

12. The Netflix court noted that the actual title holder did not appear in the group's initial motion and did not assign its claims to the group member in question. See In re Netflix, Inc., Sec., Litig., 2012 U.S. Dist. LEXIS 59465, at *18. Here, the Prosperity Group and all of the legal entities that comprise it were identified in the Prosperity Group's initial papers. (See May 7, 2012 Letter from Prosperity Group, at *1, Doc. No. 36).

and Sprint, even if the Subsidiaries have retained their authority
to pursue claims, PCM and the Funds would nevertheless lack Article
III standing.  See Sprint Commc'ns, 128 S. Ct. 2531; Huff, 549 F.3d
at 108; In re Netflix, Inc., Sec., Litig., 2012 U.S. Dist. LEXIS
59465, at *18.  Accordingly, Arkansas argues that there is a
substantial likelihood that, if the Prosperity Group were appointed
lead plaintiff, the putative class would be forced to litigate
against defenses arising from the Prosperity Group's standing.
(See Arkansas's Br. in Opp. to Competing Motion, at *4, Doc. No.
22).

     The Court agrees.  Even if this Court were to find that the
Subsidiaries satisfied the constitutional requirements of standing,
the other Prosperity Group members' lack of standing would still
prevent the Prosperity Group's appointment as lead plaintiff.  This
is because the Prosperity Group would nevertheless need to survive
the scrutiny required under the rebuttal provision of the PSLRA,
specifically that a lead plaintiff not be subject to any unique
defenses.  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).  Pursuant to the
PSLRA, it is not necessary to prove a defense; all that is required
is to show some degree of likelihood that a unique defense may play
a significant role at trial.  Beck v. Maximus, Inc., 457 F.3d 291,
300 (3d Cir. 2006); see also In re Herley, 2009 U.S. Dist. LEXIS
91600, at *40 ("Meritless defenses will not preclude a finding of
typicality [...]").  The purpose of this requirement is to protect
the other class members from the expense of litigating defenses

applicable to lead plaintiffs but not to the class as a whole.  See id; see also, In re Netflix, Inc., Sec. Litig., 2012 U.S. Dist. LEXIS 59465, at *17 (N.D. Cal. April 26, 2012).

Here, it is established that more than half of the entities that constitute the Prosperity Group lack Article III standing pursuant to Huff and Sprint.  See Sprint Commc'ns, 128 S. Ct. 2531; Huff, 549 F.3d at 108.  Thus, like the movant group in Netflix, the presence of PCM and the Funds amongst the Prosperity Group "could subject the class to the burden of litigation focused on [their] standing."  See In re Netflix, Inc., Sec., Litig., 2012 U.S. Dist. LEXIS 59465, at *18 (citing Huff, 549 F.3d at 106-07; Herley, 2009 U.S. Dist. LEXIS 91600, at *12).  In light of all of the above, the Court finds that it would be unwarranted to subject class members to a risk of prejudice stemming from the Prosperity Group's unique Article III standing issues, and that any presumption in favor of the Prosperity Group has been rebutted pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).[13]   See Huff, 549 F.3d at 106-07; Herley, 2009

13.  The Court notes that one of the primary objectives of the PSLRA was to improve dysfunctional, lawyer-driven securities class action lawsuits by affording institutional investors with the greatest financial stake in an action a more significant role in such litigation.  See In re Cendant Corp., 260 F.3d 183, 197 (3d Cir. 2001) ("Congress' clear intent in drafting the PSLRA was to transfer control of securities class actions from attorneys to class members through a properly selected lead plaintiff").  While the Prosperity Group is composed of an apparently cohesive collection of institutional investors that have suffered the largest loss in this matter and would otherwise satisfy the goals and requirements of the PSLRA, this Court cannot ignore precedent that now suggests members of the Prosperity Group lack Article III standing.  See Sprint Commc'ns, 128 S. Ct. 2531; Huff, 549 F.3d at 108;  see also In re Herley, 2009 U.S. Dist. LEXIS 91600,

U.S. Dist. LEXIS 91600, at *12; <u>In re Imax Secs. Litig.</u>, 2009 U.S. Dist. LEXIS 58219, at *13 (S.D.N.Y. June 29, 2009).  Thus, pursuant to the PSLRA, the Court must now look to the movant with the next-largest financial interest in the litigation.

Arkansas is the only other movant seeking to be appointed as lead plaintiff, and has incurred the next-largest loss after the Prosperity Group.  The Arkansas Public Employees Retirement System and the Fresno County Employees' Retirement Association have allegedly suffered combined losses totaling approximately $1,122,132 during the class period.  (<u>See</u> Arkansas's Br. in Supp. of Motion, Doc. No. 4).  Arkansas meets the typicality requirement of Fed. R. Civ. P. 23(a)(3) because its claims are typical of those of the class, and thus its interests are aligned with those of other class members.  <u>See</u> Fed. R. Civ. P. 23(a)(3).  Arkansas also satisfies the adequacy requirement of Fed. R. Civ. P. 23(a)(4). <u>See</u> Fed. R. Civ. P. 23(a)(4).  Arkansas has retained Cohen Milstein and Barrack, Rodos & Bacine, both experienced securities class action firms, as lead counsel and liaison counsel for the class. Further, Arkansas's financial interest in the litigation should ensure vigorous advocacy on behalf of the class, and there is no evidence before the court that suggests Arkansas has interests that are in conflict with those of other class members.  Accordingly, the Court recommends that Arkansas be appointed as lead plaintiff. <u>See</u> Fed. R. Civ. P. 23; 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

---

*18.

## III.   APPOINTMENT OF LEAD COUNSEL

Finally, the Court will address Arkansas's motion to appoint Cohen Milstein as Lead Counsel and Barrack Rodos as Liaison Counsel.  (See Arkansas's Motion, Doc. No. 4).  The PSLRA directs the lead plaintiff to select and retain counsel to represent the class, subject to the Court's approval.   15 U.S.C. § 78u-4(a)(3)(B)(v).  While there is a presumption in favor of approving a lead plaintiff's decisions regarding the selection and retention of counsel, the "Court has discretion to decline to appoint the candidate proposed by a lead plaintiff when warranted to protect the interests of the class."  Teran v. Subaye, Inc., 2011 U.S. Dist. LEXIS 105774, at *31 (S.D.N.Y. Sept. 16, 2011).   Here, Arkansas has selected Cohen Milstein as lead counsel and Barrack Rodos as liaison counsel.  The Court finds that these law firms are sufficiently experienced in securities class action litigation to adequately serve as lead counsel, and accordingly recommends that Arkansas's selection be approved.

## Conclusion

In light of all of the above, on this 12th day of June, 2012, it is the recommendation of this Court that Arkansas's motion [Doc. No. 4] seeking (I) appointment of Arkansas as lead plaintiff; (ii) appointment of Cohen Milstein as lead counsel and Barrack Rodos as liaison counsel; and (iii) the consolidation of the related actions be granted.  Further, it is the recommendation of this Court that the Prosperity Group's competing motion [Doc. No. 9] be denied.

Pursuant to Local Civil Rule 72.1(c)(2), any party may object to this report and recommendation "within 14 days after being served with a copy thereof."  L. Civ. R. 72.1(c)(2).

<u>s/ Karen M. Williams</u>
KAREN M. WILLIAMS
UNITED STATES MAGISTRATE JUDGE

cc: Hon. Jerome B. Simandle

31